Gregory HUGHES, et al

v.

**FORD MOTOR COMPANY.**

**Civ. No. H–84–1049 (PCD).**

United States District Court,
D. Connecticut.

Jan. 5, 1987.

Snow Gene Munford, Hartford, Conn., for plaintiffs.

Jill Hanau, Hartford, Conn., and Malcolm Wheeler, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for defendant.

RULING ON OBJECTIONS TO MAGISTRATE'S RECOMMENDED RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiffs object to the magistrate's recommended ruling on two grounds:

1. The federal regulations do not preempt the field and thus leave as a permissible ground of recovery under state law the issue whether the absence of an airbag could constitute a defect.

2. Under Connecticut law the lack of an airbag could constitute a defect.

A. *Federal Preemption*

As to the first claim, the subject of passenger restraints was covered by a Federal Motor Vehicle Safety Standard ("FMVSS") promulgated by the Secretary of Transportation as authorized by 15 U.S.C. § 1392(a). The specifically applicable standard, FMVSS 208, in effect when the vehicle in question was manufactured, a 1974 Pinto, required seat belts but permitted manufacturers to chose between an ignition interlock system with seat belts or an airbag. The history of FMVSS, detailed by the magistrate, clearly reflects Congress' backing away from requiring airbags as a passive restraint system.[1] This included a 1974 prohibition of such as airbags except with certain administrative proceedings and review by Congress. Subsequently, the Secretary of Transportation vacilated on the propriety of requiring airbag installation until issuing the present regulation that passive restraint systems will not be required until 1989 unless two-thirds of the states mandate seat belt use. It is little wonder that manufacturers of cars are in a quandry. Their motivation to provide safe vehicles is buffeted from all sides by lack of consumer commitment to use of belts[2], cost/price consciousness, and technological uncertainty as to the efficacy of airbags and the uncertainty of the law. It would be tempting to remove the uncertainty by finding that Congress has preempted the field and its preemption process has not required airbags and no other source should create an obligation to do so.

■ If Congress has established a standard which does not embrace an airbag installation, the law has repeatedly been found not to absolve a manufacturer from being held to a higher standard. Put another way, a statutorily originated standard is but a minimum requirement which is not preclusive of a higher standard. But in the field of vehicle safety and in the matter of passive restraints for occupant safety, Congress has not merely set a minimum standard. It has clearly reached out into the field via FMVSS 208, as was in effect when the 1974 car was manufactured and established a minimum standard and a maximum standard in the choice permitted. This standard would be vitiated if a jury was permitted to find that a common law standard for safety was breached, even though the congressionally adopted standard was not so breached. The manufacturer would, if plaintiffs were correct, be faced with a Hobson's choice. If, as here, the choice was for the ignition interlock, the claim would be that the lack of an airbag was a defect. If the choice was an airbag, the lack of an ignition interlock would be claimed to be a defect. There is an even greater quandry. Having made the choice and faced with the claim of a defect in the absence of whichever device was not selected, here the airbag, the vagaries of jury standards of safety could result in a different result in each suit

---

1. Passive means a device which functions without effort or decision on the part of the vehicle occupant.

2. Not to be ignored is the 1986 Massachusetts referendum which repealed the statutory mandate of use of seat belts, a manifestation of the exercise of the right to be hurt without waiver of the right to collect damages for the ensuing injury.

brought.[3] The law, as argued by plaintiffs, would thus leave to a manufacturer no choice, contrary to Congress' policy. Manufacturers would be obliged to install both devices at the expense of the consumer with no suggestion that dual installations produce any greater safety.

■ Thus, to effectuate the policy in effect in 1974, as enacted by Congress, and to avoid placing a manufacturer in the position of being unable to make its design decisions with at least a reasonable opportunity to comply with the law, manufacturers cannot be held subject to a tort law standard which would permit a jury to find a defect in the absence of an airbag.

The magistrate's recommendation that defendant's motion for partial summary judgment be granted to the extent that defendant be found not subject to a duty to install airbags in its 1974 vehicles is accepted and adopted for the reasons stated by the magistrate, as supplemented herein.

## B. *Connecticut Law*

■ While the resolution of the first basis on which the magistrate recommended granting defendant's motion would be dispositive, it is appropriate that she has also resolved the second basis of the claim— holding that Connecticut law would not permit a finding of a defect for want of sufficient safety in the vehicle which was equipped with a three point lap and shoulder belt and an integrated ignition system interlocked with use of the belt. The question presented by plaintiffs' claim is whether a jury could find that the absence of an airbag in a car with a three point seat belt and an integrated ignition interlock system provided an adequate means of safety. While ordinarily the Connecticut rule is that a product's unreasonable dangerousness is a question of fact for the jury,

*Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 235, 429 A.2d 486 (1980), such is not the case where, as a matter of law, a jury could find but one conclusion. Based on the record presented to the magistrate and her analysis, the recommended ruling that, given the expectations of the ordinary consumer, there could be no expectation that a manufacturer would provide airbags under the circumstances herein is accepted and adopted.

Accordingly, the magistrate's recommended ruling, to be deemed incorporated herein, is accepted and adopted.

SO ORDERED.

## RECOMMENDED RULING ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

JOAN GLAZER MARGOLIS, United States Magistrate.

On March 17, 1986, defendant Ford Motor Company ("Ford" or "defendant") filed a motion for partial summary judgment with respect to plaintiffs' claim that the 1974 Pinto hatchback in which plaintiff Gregory Hughes was injured was defectively designed in that the automobile did not contain an airbag as an occupant restraint system for the right front passenger side.[1] Ford's basis for such motion is two-fold: (1) that Connecticut tort law does not recognize the duty asserted in the purported claim for relief, either under a negligence or a strict liability theory; and (2) that the National Traffic and Motor Vehicle Safety Act of 1966 preempts state tort law from requiring automotive manufacturers to design and to install airbags as an occupant restraint system.

On March 17, 1986, defendant filed its memorandum of law in support of said motion ("Defendant's Brief"),[2] an affidavit

---

**3.** Indeed, a manufacturer which made cars available with either device, leaving aside the cost of providing such options, would leave to the buyer the choice provided by Congress, but without assurance that a jury would not find the buyer's choice insufficient to provide adequate safety.

**1.** This motion does not address plaintiffs' numerous other claims regarding the uncrashworthiness of the 1974 Pinto. *See* note 7 *infra.*

**2.** Attached to this brief as Exhibits 1–6 were copies of six unpublished decisions regarding similar airbag claims.

by Roger C. Wagner, a design analysis engineer in Ford's design analysis department ("Wagner Affidavit"), and its Local Rule 9(c) Statement of Material Facts. On April 18, 1986, plaintiffs filed their memorandum of law in opposition to said motion [3] and an affidavit by Carl F. Thelin, one of plaintiffs' experts with respect to automobile design and crashworthiness.[4] Defendant filed a reply brief on May 12, 1986 ("Defendant's Reply Brief").[5] Oral argument was heard on this and other motions on May 27, 1986.

For the reasons stated herein, defendant's motion for partial summary judgment is granted.

## I. FACTUAL BACKGROUND

The underlying facts, as developed during the exhaustive discovery process here, are undisputed and are as follows: On the night of November 13, 1982, plaintiff Gregory Hughes, along with several of his teenage friends, attended a party at which alcoholic beverages were consumed. At about 10:00 p.m., Hughes and four friends left the party to drive to Burger King for a snack. Hughes sat in the right front passenger seat of a 1974 Pinto and did not buckle his seat belt. This 1974 Pinto came with three-point safety belts and an ignition interlock system which prevented the car from starting if the belts in the occupied front seats were not fastened.[6] However, the driver, Andrew Titterton, was able to start the car because the ignition interlock system previously had been disconnected. During the trip, Titterton exceeded the posted speed limit, swerved off the road, crashed through a series of small trees approximately six inches in diameter, and then smashed into a larger maple tree approximately 300 feet after the car first left the road. During this accident, Hughes collided with the car's interior and sustained injuries which rendered him a quadripelgic.

On September 26, 1984, plaintiff Gregory Hughes and his father Michael Hughes brought this suit against Ford, claiming, *inter alia,* that Ford's failure to equip the 1974 Pinto with an airbag as an occupant restraint system constituted a design defect which rendered the 1974 Pinto uncrashworthy.[7] The plaintiffs' allegation was that under the "second collision" theory, the alleged design defect enhanced Gregory Hughes' injury.[8] Plaintiffs do not allege that any design defect in the 1974 Pinto caused the accident.

## II. SUMMARY OF FEDERAL REGULATION OF PASSENGER RESTRAINT SYSTEMS

A detailed analysis of the tumultuous federal regulation of automobile passenger restraints systems, including airbags, is found in defendant's Reply Brief at 12–22 and in Wilton, *Federal Issues in "No Airbag" Tort Claims: Preemption and Reciprocal Comity,* 61 NOTRE DAME L.REV. 1, 3–7 (1985) ("Wilton"), a copy of which was attached to said brief as Exhibit

---

3. Said brief is entitled "Plaintiff Hughes's Memorandum in Support of Denial of Ford's Motion for Summary Judgment."

4. Said affidavit is entitled "Motion in Opposition to Defendant's Motion for Summary Judgement [sic]." *See* Ruling on Defendant's Motion for Sanctions, filed June 24, 1986, at 28–32 (discussion of Thelin's anticipated testimony at trial).

5. Attached as Exhibit A to this brief was a copy of the unpublished decision in *Vanover v. Ford Motor Co.,* which subsequently was reported. 632 F.Supp. 1095 (E.D.Mo.1986).
   Attached as Exhibit B was a copy of a lengthy law review article, Wilton, *Federalism Issues in "No Airbag" Tort Claims: Preemption and Reciprocal Comity,* 61 NOTRE DAME L.REV. 1 (1985) ("Wilton").

6. A three-point belt is an integrated lap belt and shoulder strap attached to the car at three points. *See generally* 49 C.F.R. § 571.208. This system was in accordance with the prevailing requirements. *See* Section II *infra.*

7. "Crashworthiness" is defined as "the protection that a passenger motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle accident." 15 U.S.C. § 1901(14).

8. The term "second collision" refers to "the collision between a passenger and an interior part of the vehicle following an impact or collision" of the automobile with an outside object. *Caiazzo v. Volkswagenwerk, A.G.,* 647 F.2d 241, 243 n. 2 (2d Cir.1981).

B. *See also Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Pacific Legal Foundation v. Department of Transportation*, 593 F.2d 1338 (D.C.Cir.), *cert. denied*, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979).

Briefly, Congress in 1966 enacted the National Traffic and Motor Vehicle Safety Act ("1966 Safety Act") which required the Secretary of Transportation ("Secretary") to create Federal Motor Vehicle Safety Standards ("FMVSS") to "meet the need for motor vehicle safety." 15 U.S.C. § 1392(a). "Motor vehicle safety" is statutorily defined as that degree of protection necessary to protect the motoring public

against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and ... unreasonable risk of death or injury to persons in the event accidents do occur....

15 U.S.C. § 1391(1). The Secretary is required, in promulgating any FMVSS, to consider what is "reasonable, practicable and appropriate." 15 U.S.C. § 1392(f)(3).

The next year, the National Highway Traffic Safety Administration ("NHTSA") of the Department of Transportation ("DOT") adopted FMVSS 208, which required the installation of seat belts. 32 Fed.Reg. 2408, 2415 (Feb. 3, 1967). Two years later, the NHTSA published an advance notice of proposed rulemaking, which requested information on "passive occupant restraint systems."[9] 34 Fed.Reg. 11148 (July 2, 1968). NHSTA amended FMVSS 208 in November 1970 to require the installation of passive restraints for front seat passengers, effective July 1, 1973 and for all other passengers, effective July 1, 1974. 35 Fed.Reg. 16927 (Nov. 3, 1970). Four months later, the NHSTA amended FMVSS 208 to postpone the effec-

tive dates until August 15, 1973 and August 15, 1975, respectively. 36 Fed.Reg. 4600 (Mar. 10, 1971). FMVSS 208 was further amended in 1972 so that with respect to front seat passengers, automobiles built between August 15, 1973 and August 15, 1975 could be equipped either with passive restraint systems or an ignition interlock system which would prevent the vehicle from starting if lap and shoulder belts were not utilized; by August 15, 1975, rear seat passengers also were to be protected by passive restraints. 37 Fed.Reg. 3911 (Feb. 24, 1982).

In 1974, Congress enacted 15 U.S.C. § 1410b(b)–(d) which, *inter alia*, prohibited the DOT from requiring airbags or other non-seat belt systems without special administrative proceedings and Congressional review.[10] Thereafter, the DOT vacillated on its position regarding passive restraint systems. For example, in 1976 Secretary Coleman did not require airbags. 41 Fed. Reg. 24070 (June 14, 1976). The next year, however, his successor, Secretary Adams, required passive restraint systems commencing with the 1982 model year and phased in over a three-year period. 42 Fed.Reg. 34290, 34295 (July 5, 1977). This requirement, however, was rescinded in 1982 by Secretary Lewis, the NHSTA instead requiring detachable automatic belts.[11] 46 Fed.Reg. 53419 (Oct. 29, 1981). The United States Supreme Court later found that such action had been taken without the proper administrative procedures and thus reversed and remanded the matter for further administrative consideration. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., supra.*

Upon remand, the NHSTA conducted exhaustive hearings following which Secretary Dole promulgated the present FMVSS

---

**9.** The two major "passive" occupant restraint systems are automatic seat belts (*see* note 11 *infra*) and airbags. 49 C.F.R. 28962, 28965 (July 17, 1984).

**10.** As Wilton observed, the Congressional veto "is undoubtedly unconstitutional" in light of *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317

(1983). Wilton, *supra*, 61 NOTRE DAME L.REV. at 5 n. 30.

**11.** Automatic seat belts, also known as passive seat belts, automatically lock into place when the occupant closes the car door. *Pacific Legal Foundation v. Department of Transportation, supra*, 593 F.2d at 1340 n. 6; 49 Fed.Reg. at 28962, 28992–93 (July 17, 1984).

208, 49 Fed.Reg. 28962 (July 17, 1984), now found in 49 C.F.R. § 571.208, § 4.1.2 to § 4.1.5 (1985). This version requires automobiles to be equipped with three-point seat belts until September 1, 1986, when thereafter passive restraint systems become mandatory on a phase-in basis until September 1, 1989. *Id.* at 29009–10, 28999–29000, 28963. However, the passive restraint requirement will be rescinded if, by April 1, 1989, states with two-thirds of the United States population adopt mandatory seat belt laws. *Id.* at 29010, 28963, 28998.[12]

The NHSTA articulated several reasons for not requiring airbags at the present time. First, airbags provide no protection in non-frontal collisions, so that a lap belt or lap-shoulder belt is still necessary. *Id.* at 28984, 28986. Second, the three-point seat belt, when worn, provides better protection than an airbag alone or an airbag in conjunction with a lapbelt. *Id.* at 28985. Also observed were the problems of using airbags in smaller automobiles, where the smaller leg room would impede inflation of an airbag. *Id.* at 28974, 28992, 29001. Third, airbags were not seen as being cost effective, the NHSTA estimating that the incremental cost for airbags (including both manufacturing costs and increase fuel use due to the heavier system) for both front passengers was $359–64; industry estimates, however, were from $800 to $1800. *Id.* at 28990, 29001, 28969. In addition, once deployed, an airbag would need to be replaced at an estimated cost of $800; an owner's failure to replace the airbag would result in no protection for front seat passengers at all. *Id.* at 28990, 29001. And last, airbags present their own dangers, especially to children. *Id.* at 28992, 29001.

In the 1974 model year, over thirty foreign and domestic automobile manufacturers sold approximately 8,800,000 new cars in this country. Wagner Affidavit ¶ 4. Less than 6,000 cars sold in model year 1974 came equipped with airbags; all of these cars were full-sized models by General Motors whose weight and cost were ap-

proximately twice that of the 1974 Pinto. *Id.*

For the recent model year, which ends in August 1986, the only models which offer airbags as an option are the Ford Tempo/Topaz, the BMW 735, and Mercedes Benz, and in those cars the airbag is available only on the driver's side, not the front right passenger's side. *Id.* ¶ 5. None of these cars are subcompacts. *Id.* The price for this option is $816 for the Ford and $880 for the Mercedes. *Id.*

## III.  DISCUSSION

F.R.Civ.P. 56(c) provides that summary judgment shall be granted where it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the defendant's burden to show that there exists no genuine issue of material fact to be tried. *See Heyman v. Commerce & Industry Co.,* 524 F.2d 1317, 1319 (2d Cir.1975).

**A.  Under Connecticut Tort Law, Defendant Had No Duty to Install Airbags in its 1974 Pintos**

As previously mentioned, plaintiffs allege that the 1974 Pinto in which plaintiff Gregory Hughes was injured was uncrashworthy in that it did not come equipped with an airbag to protect the front right passenger against injuries in frontal collisions. The seminal case on "uncrashworthiness" or the "second collission" theory is, of course, *Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir.1968) ("*Larsen*"), where the Eighth Circuit ruled that automobile accidents are "readily foreseeable as an incident to the normal and expected use of an automobile," so that an automobile manufacturer should be liable under general negligence principles "[w]here the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its product to an unreasonable risk of injury

---

**12.**  According to Ford, twenty-two states and the District of Columbia now have mandatory seat belt laws; thirty-five countries also have similar laws.  Defendant's Reply Brief at 21 n. *.  *Cf.* 49 Fed.Reg. 28962, 28993–94, Table 11 (July 17, 1984).

..." *Id.* at 502. The Court continued, however,

> We do agree that under the present state of the art an automobile manufacturer is under no duty to design an accident-proof or fool-proof vehicle or even one that floats on water, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision....
>
> \* \* \* \* \* \*
>
> ... The duty of reasonable care in design should be viewed in light of the risk. While all risks cannot be eliminated nor can a crash-proof vehicle be designed under the present state of the art, there are many common-sense factors in design, which are or should be well known to the manufacturer that will minimize or lessen the injurious effects of a collision....

*Id.* at 502–03.

This doctrine has been applied by a large number of courts, including the Second Circuit, in *Caiazzo v. Volkswagenwerk A.G.*, 647 F.2d 241, 246–247 (2d Cir.1981) (applying New York law). Connecticut also appears to have applied the "second collision" or "enhanced injury" doctrine as well. *Balboni v. American Honda Motor Co., Inc.*, Dkt. No. 221355 (Super.Ct. Feb. 14, 1980), *reprinted in* 6 *Conn.L.T.* No. 13, at 17 (Mar. 31, 198) (citing *Larsen*); *LaPlante v. Honda Motor Co., Ltd.*, Dkt. No. 182188 (Super.Ct. Jan. 22, 1980), *reprinted in* 6 *Conn.L.T.* No. 7, at 15 (Feb. 18, 1980), as corrected, 6 *Conn.L.T.* No. 9, at 2 (Mar. 3, 1980) (citing *Larsen*); *DeFelice v. Ford Motor Co.*, 28 Conn.Supp. 164, 255 A.3d 636 (Super.Ct.1969) (dicta) (without mentioning *Larsen*). The question of a manufacturer's duty in the design of an automobile is a question of law for the court. *Dawson v. Chrysler Corp.*, 630 F.2d 950, 956 (3d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1069 (4th Cir.1974); *Larsen, supra*, 391 F.2d at 498. *Cf. Huddell v. Levin*, 537 F.2d 726, 734–35 (3d Cir.1976) ("...

the court must make a threshold determination whether there exists any legal obligation at all running from G.M. to the plaintiff.").

As the Connecticut Supreme Court recently stated, the court does not recognize "a duty in the air." *Shore v. Town of Stonington*, 187 Conn. 147, 151, 444 A.2d 1379, 1381 (1982). The extent of the duty is a question of law for the court, not a question of fact for the jury; only if such a duty is found to exist does the jury "then determine whether the defendant violated that duty in the particular situation at hand." *Id.* at 151–52, 444 A.2d at 1381; *Sheiman v. Lafayette Bank & Trust Co.*, 4 Conn.App. 39, 44–45, 492 A.2d 219, 222 (App.Ct.1985).

The *Larsen* court observed in 1968 that while a "crash-proof vehicle" could not be "designed under the present state of the art," nevertheless there are "many common-sense factors in design, which are or should be well known to the manufacturer that will minimize or lessen the injurious effects of a collision." 391 F.2d at 503. In model year 1974, it does not appear that airbags were among the "common-sense" design factors which were or should have been well known to automobile manufacturers. Of the 8,800,000 new cars sold in this country that year, less than 6,000 (or 0.6818%) were equipped with airbags. In addition, none of these cars were subcompacts within the same weight and price range as the Pinto. Even today, some twelve years later, airbags are available as an option in only the Ford Tempo/Topaz, the BMW 735, and the Mercedes Benz, on the driver's side only.

Equally significant is that during the time in question, FMVSS 208 required front seat passengers to be protected *either* by a passive restraint system *or* an ignition interlock system. 37 Fed.Reg. 3911 (Feb. 24, 1982). Ford choose the latter route, the ignition interlock system, for the 1974 Pinto. During that same year, Congress enacted 15 U.S.C. § 1410b(b)–(d) which significantly limited the NHTSA's ability to promulgate regulations requiring airbags. As set forth in Section II. *supra*,

the DOT's position with respect to airbags was certainly not a case of unwaivering enthusiasm therefor; three of the four DOT Secretaries expressed strong disapproval of airbags. While passive occupant restraint systems (including airbags) are to be phased in over a three-year period, commencing with next year's model year, such requirement is to be rescinded if a sufficient number of states impose mandatory seat belt laws by April 1, 1989.

The 1966 Safety Act, however, provides that compliance with any FMVSS issued "does not exempt any person from any liability under common law." 15 U.S.C. § 1397(c). *See generally* Wilton, *supra,* 61 NOTRE DAME L.REV. at 20–27. The *Larsen* court analyzed § 1397(c) as follows:

> It is apparent that the National Traffic Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability. The common law is not sterile or rigid and serves the best interests of society by adopting standards of conduct and responsibility that fairly meet the emerging and developing needs of our time. The common law standard of a duty to use reasonable care in light of all the circumstances can at least serve the needs of our society until the legislature imposes higher standards or the courts expand the doctrine of strict liability for tort. The Act is a salutary step in this direction and not an exemption from common law liability.

391 F.2d at 506.

Several federal courts have held that compliance with the FMVSS's does not *ipso facto* insulate an automobile manufacturer from either compensatory and/or punitive damages. *E.g., Dorsey v. Honda Motor Co., Ltd.,* 655 F.2d 650, 656–57 (5th Cir. 1981); *Dawson v. Chrysler Corp., supra,* 630 F.2d at 957–58. However, these cases involved defects not regulated by a specific FMVSS. In *Dorsey,* the Fifth Circuit ruled that compliance with the FMVSS's may be admissible on the issue of care but does not require a jury to find a defendant's conduct was reasonable. 655 F.2d at 656. In a similar vein, the Third Circuit ruled in

*Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 846 (3d Cir.1981) that an analogous FMVSS may be admitted as establishing the appropriate requirement but that failure to comply therewith was not, by itself, evidence of negligence and that the jury should take the FMVSS and all other evidence into account in assessing any breach of duty or care. At the opposite spectrum is *Hurt v. General Motors Corp.,* 553 F.2d 1181, 1184 (8th Cir.1977), where the Eighth Circuit ruled that in the absence of any evidence that the seat belt in question was defective, compliance with the applicable FMVSS should have entitled the automobile manufacturer to a directed verdict.

Wilton suggests, at least with respect to the preemption issue, *see* Section III.C. *infra,* that a cause of action under state tort law should be permitted only where the plaintiff alleges (1) a defect not specifically addressed by an FMVSS or (2) a failure to comply with any applicable FMVSS. 60 NOTRE DAME L.REV. at 23. Wilton would also prohibit any claims that an item expressly permitted under the relevant FMVSS was defective. *Id.* Thus, Wilton concludes that § 1397(c)

> cannot save [no-airbags claims]. ... [T]he NHTSA decision not to require airbags, but rather to give manufacturers the option to meet the requirement in different ways, serves two specific policy objectives that would be defeated by a state tort standard mandating installation of airbags to avoid liability. The decision not to mandate immediate installation has been NHTSA's consistent response to a continuing concern about the safety of current airbag technology. Moreover, NHTSA's decision to allow a choice of compliance methods was designed to encourage manufacturers to develop new or more effective restraint technologies rather than locking them into a single device....

*Id.* at 26–27 (footnotes omitted).

In the present action, plaintiffs allege that Ford had a duty to install airbags in its 1974 Pintos. Here, the applicable FMVSS, FMVSS 208, did not require the installation of airbags but allowed the auto-

mobile manufacturer to choose between passive restraint systems or ignition interlock systems. In 1974, Congress passed legislation which placed several impediments upon the NHSTA before that agency could promulgate regulations requiring airbags. 15 U.S.C. § 1410b(b)–(d). The "resonableness" of Ford's decision not to install airbags for front seat passengers in 1974 Pintos must be measured against this legislative and administrative disapproval of airbags. FMVSS 208 need not be the sole factor in determining no liability on the part of Ford for failing to equip its 1974 Pintos with airbags; however, FMVSS 208 was the catalyst for an enormous amount of research and analysis by industry representatives, government officials, and public interest groups, whether before the NHTSA, Congress, or the federal courts. Given the prevailing view of airbags at the time, as expressed at and by these administrative and legislative bodies, it was not unreasonable for Ford to manufacture 1974 Pintos which were not equipped with airbags designed to protect the front right passenger from injuries sustained in a frontal collision.

*See also Vanover v. Ford Motor Co.*, 632 F.Supp. 1095 (E.D.Mo.1986) (granting defendant's motion for summary judgment on airbags claim); *Higgs v. General Motors Corp.*, 655 F.Supp. 22 (E.D.Tenn.1985) (same); *Evers v. General Motors Corp.*, Civ. No. 81–1108–Civ–T–GC (M.D.Fla. Aug. 3, 1984), *aff'd on other grounds*, 770 F.2d 984 (11th Cir.1985).[13]

B. Under Connecticut Law, the 1974 Pinto, Which was Equipped with Integrated Lap and Shoulder Belts and an Ignition Interlock System, and not Airbags, was not Defective and Unreasonably Dangerous

Connecticut has long followed the principles of strict liability set forth in § 402A of the Restatement (Second) of Torts. *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 233–34, 429 A.2d 486, 488 (1980)

("*Giglio*"); *Rossignol v. Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 559, 227 A.2d 418, 423 (1967) ("*Rossignol*"); *Garthwait v. Burgio*, 153 Conn. 284, 289–90, 216 A.2d 189, 192 (1965). Strict liability is imposed, as a matter of public policy, upon a manufacturer to protect consumers from defective products which are unreasonably dangerous. *Rossignol, supra,* 154 Conn. at 558–59, 227 A.2d at 423; *DeFelice v. Ford Motor Company, supra,* 28 Conn. Supp. at 168, 255 A.2d at 638. The doctrine of strict liability requires a plaintiff to prove that:

> (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition.

*Giglio, supra,* 180 Conn. at 234, 429 A.2d at 488; *Rossignol, supra,* 154 Conn. at 562, 227 A.2d at 424; *Living & Learning Centre, Inc. v. Griese Custom Signs, Inc.*, 3 Conn.App. 661, 664, 491 A.2d 433, 435 (App.Ct.1985); *Coe–Park Donuts, Inc. v. Robertshaw Controls Co.*, 1 Conn.App. 84, 86, 468 A.2d 292, 293 (App.Ct.1983); Restatement (Second), Torts § 402A. *See also Standard Structural Steel v. Bethlehem Steel Co.*, 597 F.Supp. 164, 183 (D.Conn.1984).

At issue here is the second element of the doctrine, *i.e.*, did the lack of an airbag as an occupant restraint system for the right front passenger side of the 1974 Pinto constitute a design defect which created an unreasonably dangerous product for consumers. *Giglio, supra,* 180 Conn. at 234, 429 A.2d at 488.

In the context of crashworthiness, the Third Circuit has stated that the court makes the threshold determination as to whether a product is defectively designed. *See Huddell v. Levin, supra,* 537 F.2d at

**13.** The unpublished decisions in *Higgs* and *Evers* are found as Exhibits 5 and 4 to Defendant's Brief.

734–35. This differs, however, from the law in Connecticut, for the Connecticut Supreme Court has held that "[w]hether a product is unreasonably dangerous is a question of fact to be determined by the jury." *Giglio, supra,* 180 Conn. at 235, 429 A.2d at 489; *Slepski v. Williams Ford, Inc.,* 170 Conn. 18, 23, 364 A.2d 175, 178 (1975) ("*Slepski*"). *See also Liberty Mutual Insurance Co. v. Sears, Roebuck & Co.,* 35 Conn.Supp. 687, 691, 406 A.2d 1254, 1256 (Super.Ct.App.Sess.), *cert. denied,* 177 Conn. 754, 399 A.2d 526 (1979) ("*Liberty Mutual*"). The Supreme Court has adopted the definition found in Comment i of the Restatement (Second) of Tort, § 402A that an "unreasonably dangerous" product is one

> dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

*Giglio, supra,* 180 Conn. at 234, 429 A.2d at 488; *Slepski, supra,* 170 Conn. at 23, 364 A.2d at 178. *See also Liberty Mutual, supra,* 35 Conn.Supp. at 690–91, 406 A.2d at 1256. As the Supreme Court has stated: "... the jury can draw their own reasonable conclusions as to the expectations of the ordinary consumer and the knowledge common in the community at large." *Giglio, supra,* 180 Conn. at 234, 429 A.2d at 489; *Slepski, supra,* 170 Conn. at 23, 364 A.2d at 178. *See also Standard Structural Steel v. Bethlehem Steel Co., supra,* 597 F.Supp. at 183; *Liberty Mutual, supra,* 35 Conn.Supp. at 691, 406 A.2d at 1256.

As set forth in Section III.A. *supra,* only a minute fraction of the 1974 model year cars came equipped with airbags. Even at the present time, relatively few cars have this additional safety feature. This case presents one of those rare instances in which a court may find, as a matter of law, that a product was not "unreasonably dangerous," as the ordinary consumer who purchased the 1974 Pinto, with the ordinary knowledge common to the community, could not possibly have contemplated the presence of airbags. As the court stated in *Vanover v. Ford Motor Company, supra,* regarding this precise issue, "... plaintiffs could not have expected that an airbag would pop-out of the dashboard." 632 F.Supp. at 1098. The same conclusion also was reached in *Higgs v. General Motors Corp., supra,* at 26, with respect to a product liability act which codified the standard set forth in Comment i to § 402A.

C. Since Connecticut Tort Law Does Not Differ from Federal Law Herein, the Preemption Issue Need not be Resolved Here

The 1966 Safety Act, as amended in 1982, expressly provides:

> Whenever [a FMVSS] established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable at the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard identical to a Federal safety standard....

15 U.S.C. § 1392(d).[14] *See generally* Wilton, *supra,* 61 NOTRE DAME L.REV. at 12–35. In *Vanover v. Ford Motor Co., supra,* the district court recently held that § 1392(d) "on its face preempts plaintiffs' attempt to create an airbag requirement under state tort law." 632 F.Supp. at 1096.

However, as this recommended ruling previously found that plaintiffs have no claim against defendant under Connecticut tort law, *see* Sections III.A. & B., *supra,* the preemption issue need not be resolved here.

## IV. CONCLUSION

For the reasons stated above, defendant's motion for partial summary judgment on the airbags claim is granted.

---

**14.** Pub.L. 97–331, § 3, 96 Stat. 1619, added the second sentence. *See* Senate Report No. 97-505, 1982 U.S.Code Cong. & Adm.News 3169, 3173–74.

*See* 28 U.S.C. Section 636(b); F.R.Civ.P. 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut.

Dated at New Haven, Connecticut, this 17th day of July, 1986.